UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ALL-TAG CORP.,

                    Plaintiff,

          v.

CHECKPOINT SYSTEMS, INC.,

                    Defendant.

Case No. 17-81261-CIV-WPD

SECOND AMENDED COMPLAINT

(JURY TRIAL DEMANDED)

1.     Plaintiff All-Tag Corp. ("All-Tag") brings this complaint against defendant Checkpoint Systems, Inc. ("Checkpoint") for damages, equitable relief, and any other available legal or equitable remedies resulting from Checkpoint's anticompetitive and deceptive conduct.

## I.     NATURE OF ACTION

2.     This action alleges a campaign of anticompetitive, deceptive, predatory, and unfair conduct by the dominant supplier of labels and tags that enable detection in electronic article surveillance (or EAS) systems in the United States.  Retailers of foods, drugs, books and other small items purchase over a billion of these products every year, attach them to packages or slip them inside, and then monitor their movement with equipment that detects radio frequencies the labels emit.  A radio-frequency (or RF) label on a product is the last chance to catch a thief trying to abscond with it.  Checkpoint has monopolized the markets for these products (often collectively called "labels" or "labels and tags" herein),

1

thwarted and harmed competition, and caused damage to All-Tag, Checkpoint's primary rival in the relevant markets.

3.     For over forty years, Checkpoint has enjoyed a monopoly in the sale of RF labels to retailers such as drug stores, mass merchandisers and discount or "dollar" stores.  Checkpoint admits that labels are "high-margin items," a source of profits that it obtains by leveraging the power of its installed base and dominant position selling and servicing EAS system components.

4.     All-Tag offers customers an alternative to Checkpoint's monopoly. All-Tag began sales in the United States in 2000, and built a reputation for supplying innovative, high-quality RF labels, made in America in a modern Florida facility since 2011.  Domestic production, supported by excellent service, enables All-Tag to respond rapidly to customer demands.

5.     Since All-Tag's entry, Checkpoint has exploited its market dominance and monopoly power to lock in customers and foreclose the RF label markets from All-Tag and other competitors.  Taking advantage of the installed base, substantial cost and unsuitable alternatives for the expensive EAS fixtures Checkpoint sells and services, it demands exclusive deals on its own labels.  A retailer in need of Checkpoint's detection systems, repair services, and other EAS system components must commit to buy labels from Checkpoint, foreclosing the possibility of purchases from All-Tag and other suppliers.  Checkpoint for years, in

2

its annual reports and investor presentations, has touted the high margins it makes on labels, and attributes those margins to the bundled deals that exclude competitors.

6.     In addition to facing the barriers of Checkpoint's exclusive contracts with retailers, All-Tag has suffered and continues to suffer from a series of unscrupulous and predatory efforts on the part of Checkpoint to kill or cripple All-Tag.

7.     Checkpoint's predatory conduct includes a long and deliberate campaign of false and disparaging information about All-Tag's labels.  Checkpoint repeatedly and falsely claimed that All-Tag's products infringed on its own.  It repeatedly and falsely claimed, and continues to claim, that All-Tag labels are inferior to its own.  It threatens to withhold service on already-installed Checkpoint systems if the customers purchased labels from All-Tag.  Checkpoint has done it for years, and is doing it today.

8.     For example, Checkpoint claims that All-Tag's products are inferior to its own labels in respects that go to the heart of RF label functionality: reliability of detection by towers, reliability of deactivation at checkout, and frequency of accidental reactivation after checkout.  To lend credence to its claims, Checkpoint has rigged comparative evaluations of its and All-Tag's products.

Checkpoint misrepresents the rigged tests as independent proof of its products'
superiority to make its falsehoods more persuasive.

9.    All-Tag has demanded that Checkpoint cease and desist spreading the
false claims, and All-Tag had reason to believe that Checkpoint had complied.
Unbeknownst to All-Tag, Checkpoint continued to promote rigged tests and false
comparisons, with knowledge of their bias and falsity, and has done so up to this
day, costing All-Tag substantial business and depriving customers of competition
on the merits.

10.    Through the combination of its deceptive, anticompetitive, and
unlawful practices, Checkpoint has damaged All-Tag, has suppressed competition
in markets for RF labels in the United States, and has illegally maintained its
monopoly in those markets.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to
28 U.S.C. §§ 1331 (federal question), 1337 (commerce and antitrust regulation),
1367 (supplemental jurisdiction over state law claims), and 15 U.S.C. §§ 2, 15, 22,
and 26 (antitrust jurisdiction), and 15 U.S.C. § 1121 (Lanham Act jurisdiction).

12.    This Court also has jurisdiction over this action pursuant to 28 U.S.C.
§ 1332 (diversity).  Plaintiff and Defendant reside in different States, and the
amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over Checkpoint because Checkpoint conducts substantial business within the Southern District of Florida.

14.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred and originated within the Southern District of Florida.

15.     Checkpoint regularly and continuously conducts business in interstate and foreign commerce between and among the several United States and foreign countries.  The interstate trade and commerce involved and affected by Checkpoint's violations of the antitrust and other federal laws was carried on, in part, within the Southern District of Florida.

### III.   PARTIES

16.     Plaintiff All-Tag Corp. is a corporation organized and existing under the laws of the State of Florida with its principal place of business located at 1155 Broken Sound Parkway NW, Unit E, Boca Raton, Florida.

17.     Defendant Checkpoint Systems, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business located at 1 Wolf Drive, Thorofare, New Jersey.  Checkpoint was acquired in 2016 by CCL, a Canadian corporation headquartered in Toronto, Ontario.

## IV.   FACTUAL ALLEGATIONS

**A.   Background**

18.     Shoplifting adds over ten billion dollars of costs to the goods that American consumers buy every year.  Thieves walk out of retail stores with hundreds of millions of items, concealed under coats and sleeves, dropped in pockets, purses, bags and boxes, or casually carried in plain sight.  Approximately 2% of all retail inventory in the United States disappears into the hands of thieves.

19.     The smaller the object, the easier it is to steal.  The more valuable the object, the more rewarding it is to steal.  Items that are both small and valuable are therefore prime targets for shoplifters, and exposed assets for retailers.  Drugs, cosmetics, toiletries, and electronics are especially popular with thieves.  Drug stores suffer the worst theft of any retail sector.

20.     The last line of defense against the shoplifters is a label or tag that is attached to a product or package at risk of theft.  The labels at issue in this case are small and contain radio-frequency (RF) transmitters that can be detected by sensors in gates or towers as the goods pass nearby.  The transmitters are deactivated at checkout, so they can pass a sensor without triggering an alarm.  But when an unpurchased item with an active label nears a sensor, a communication between the label and the sensor generates a signal or sounds an alarm that the item is on the move.  Stores and warehouses install sensors near exits and in areas where

goods might be hidden or diverted, thus creating an environment under electronic active surveillance.

21.     Most large American retailers use some form of electronic article surveillance (EAS) to reduce shoplifting at their stores.  In these systems, pedestals are installed at store or department exits.  These pedestals are radio sets that operate as transmitters and receivers of electronic signals.  They are designed to activate – typically by sounding or sending an alarm – when specially designed tags or labels attached to the merchandise pass by them.

22.     In common applications, the RF tags or labels at issue in this lawsuit consist of electrical circuits, often so finely printed that they can fit on an innocuous sticker located on or inside packages of small consumer products.  Each label contains an antenna tuned to the radio frequencies emitted by the pedestal. Equipment at the checkout counter can deactivate the antenna by breaking the circuit that powers the antenna.  If the antenna has not been deactivated, the label responds to the radio signals emitted by the pedestal by emitting a small radio signal of its own.  This return signal tells the pedestal that an active label is passing through the gate between the pedestals, indicating merchandise that was not checked out.  The pedestal then sounds or sends an alarm.

23.     Two technologies are available to support EAS in retail stores – RF and Acousto Magnetic (or AM).  RF labels are small and flexible, in contrast to

AM tags, which are thicker, larger and more rigid.  RF towers will not read AM tags, and AM towers will not read RF tags.

24.     The large tags bolted to garments and chained to boxes until removed at checkout use both RF and AM technology.  But, even the smallest AM tags are too large and cumbersome to attach to many small items, curved containers, and irregularly shaped merchandise.  When attached to small products, AM tags can change the dimensions of products and cause products to tip over, complicating shelf stocking and reducing display options.  Retailers who need small and flexible labels therefore opt for RF technology and compatible equipment.

25.     For retailers and wholesalers of smaller products, the only feasible option for an EAS attachment is a small disposable RF label that adheres to a package or is inserted inside it.  At the most inconspicuous level, RF labels can be thin stickers hidden within the product or barely noticeable on the outside.  They can also be imprinted with the name of the retailer, the price of the item, or other identifying information.  Besides shape and size, labels and tags also vary in their resistance to moisture (as is necessary for fresh grocery products), to bending and flexing (as needed when attached to paper and other flexible goods), and resistance to electromagnetic interference (as required on metal products).

26.     The systems at issue in this case all use radio frequency (RF) transmissions.  RF labels and tags are the only type that can be reduced to paper-thin appliques that can be attached to small items such as food and drug packages.

27.     Approximately one billion RF labels are sold annually.  Sales of RF labels would be higher but for Checkpoint's monopolization of the label markets.

28.     An estimated 40,000 retail establishments have installations of sensors and related hardware that read and respond to RF labels.  These fixtures can operate reliably for many years, but their surveillance works only for goods that bear RF labels.  Without a tag, an item is invisible to a sensor.  For EAS to function, RF labels must be attached to products before retailers stock their shelves.  Retailers and packagers buy RF labels from Checkpoint, All-Tag, and a few other competitors.

29.     Although most RF labels are applied by retailers in their stores, it often makes sense for the labels to be applied during the manufacturing and packaging of products.  It is sometimes more efficient, for example, when the label is to be placed inside the product or inside sealed packaging, to do so before the package is closed.  Automated equipment at packing facilities can also be more efficient than retail employees at applying external labels.  In these cases, retailers arrange with suppliers to label the products.  The retailers provide specifications for the labels, and sometimes specify which label suppliers may use.

9

30.     The practice of affixing RF tags or labels to a product at the manufacturing stage is called "source tagging," and it forms part of the markets for RF labels.  Major suppliers that use RF labels include Procter & Gamble, Unilever, and other large manufacturers.  Packaging companies that manufacturers use to package products also apply RF labels to their products.

31.     Checkpoint has been producing radio-based EAS systems for approximately 45 years.  It provides full RF systems, including the pedestals, software, and support services that make up such systems, in addition to labels and tags.

32.     RF labels and tags have to be matched to the radio signals emitted by specific RF pedestals.  Thus, RF labels and tags are made to be compatible with the frequencies that EAS systems use.

33.     Installing an RF EAS system, including the pedestals, deactivators, associated equipment and software, is a significant capital investment for any retailer or other organization.  That investment is orders of magnitude greater than the cost of a typical order of labels or tags.  Accordingly, once customers choose a supplier of RF EAS fixtures, they very rarely switch from the incumbent to a different supplier.  Customers are effectively locked in to their RF EAS systems.

34.     The vast majority of RF-based EAS systems installed in the United States are supplied by Checkpoint.  It relies heavily on this base for its net

revenues.  "Our base of installed systems provides a source of recurring revenues from the sale of disposable tags, labels, and service revenues." Checkpoint 2015 Annual Report at 40.  "We believe that our base of recurring revenue (revenues from the sale of consumables into the installed base of security systems, apparel tags and labels, hand-held labeling tools and services from maintenance), repeat customer business [restructuring and borrowing] should provide us with adequate cash flow and liquidity to execute our strategic plan." *Id*. at 30.

35.    All-Tag started selling RF labels in the U.S. in late 2000.  All-Tag's focus at the beginning, and still its primary business, has been the manufacturing and sale of RF labels and tags compatible with Checkpoint pedestals and similar sensors for both retailer and source-tagging customers.

**B.    The Relevant Markets and Checkpoint's Monopoly Power**

36.    One of the relevant markets in which Checkpoint's anticompetitive and deceptive conduct has harmed competition is the market for RF labels and tags sold to retailers with RF EAS systems already installed.  For a retailer that has adopted an RF EAS system, there is no alternative to the purchase of RF labels and tags because other types of labels and tags (such as AM) are incompatible with the RF EAS systems.  It would also be prohibitively expensive for the retailer to switch to another type of EAS system after installing the RF equipment.

11

37.     Other relevant markets include drug stores, grocery stores, and other stores selling small items, regardless of whether they have an RF EAS system already installed.  Retailers of small items have no choice but to use RF technology if they want EAS at all, because RF tags are the only type small and flexible enough to fit on the small and irregular shapes of groceries, drugs, cosmetics and similar merchandise.  Prices of the labels could increase significantly, and customers could not find an economic alternative to the labels.

38.     The relevant geographic markets in which to assess the anticompetitive effects of Checkpoint's conduct are the United States and Florida. Retailers, suppliers, and other customers for RF labels and tags in the United States purchase the vast majority of their requirements from suppliers located in the United States.  Foreign suppliers of RF labels are not practical alternatives for U.S. customers because of the shipping costs, lack of a distribution network, and foreign suppliers' disadvantage in providing customer service.  As a result, a small but significant non-transitory increase in the price of RF labels from U.S. suppliers would not cause customers to turn to foreign sources of supply.

39.     Checkpoint commands market shares of over 80 percent and higher in the relevant markets.  These shares have remained at comparable levels for decades.

40.     Checkpoint's decades of high market shares are indicators of monopoly power in the markets for RF labels and tags.

41.     Entry conditions in the markets are unlikely to erode Checkpoint's monopoly power.  RF-label manufacturing requires specialized equipment and expertise that raise barriers to entry to the relevant markets.  In twenty years, no manufacturer has attained more than a tenuous toehold in any relevant market.

## C.     Checkpoint's Anticompetitive Exclusive Dealing and Predatory Bundling

42.     Checkpoint admits that it markets by taking advantage of its "unique position as a one-stop provider of integrated and complete solutions for retailers." 2015 Annual Report at 9.  Checkpoint uses its unique position to extract customer commitments to making Checkpoint the exclusive supplier of RF labels and tags.

43.     In or around 2010, Checkpoint offered a major department store chain expensive equipment, such as a closed-circuit TV (CCTV) monitoring system, in exchange for the retailer's long-term exclusive commitment to purchase RF labels from Checkpoint.  The effect of this bundling made it impossible for All-Tag to compete for the business on the economic merits.  The chain agreed to the contract, and All-Tag was foreclosed from selling to this customer for three years.  All-Tag suffered estimated losses of $3,000,000 during the period of exclusivity.

44.     In 2014, a major discount or "dollar" store chain had reached an agreement with Checkpoint for a 4-year exclusive agreement for the provision of

13

RF labels.  This contract, which bundled EAS fixtures with RF labels, is worth approximately $5 million per year in label sales revenues.  In its 2014 annual report, Checkpoint boasted of this 8,000-store rollout as "the largest chain-wide EAS rollout in Checkpoint's history."

45.     In the summer of 2016, Checkpoint offered another chain of discount stores a similar deal of discounts on Checkpoint pedestals and other system components for the stores in exchange for the exclusive supply of RF labels by Checkpoint, not only as applied by the store chain, but as source-tagged by any of its suppliers.  The store chain, which at the time was a customer of All-Tag, then informed All-Tag personnel that it could not purchase for its own use, or approve for use by suppliers, any All-Tag RF labels because of a two-year exclusivity agreement it had signed with Checkpoint.

46.     All-Tag has been forced out of a major bookstore chain after Checkpoint threatened the chain with price increases on RF pedestals and other system service and components if it gave any RF label and tag business to any person other than Checkpoint.

47.     Retailers and other RF-label customers accept Checkpoint's exclusive terms for the supply of its labels and tags, not because they desire to be limited to a single source for these items, or because they consider Checkpoint's products

superior, but because of the conditions that Checkpoint imposes on retailers buying its EAS fixtures.

48.   ███████████████████████████████████████████ ███████████████████████████████████████ Checkpoint organized competing customers to agree, combine, or conspire to request and accept Checkpoint labels.

49.   Customers prefer to have multiple options for their purchases of RF labels and tags, but are coerced into accepting Checkpoint's exclusive terms though discounts that cannot be offered by dedicated label competitors.

50.   The intent and effect of these exclusive agreements is to foreclose a substantial share of the RF label markets from All-Tag and any other actual or potential competitors. Checkpoint's exclusive dealing in labels, admittedly leveraged from the power of its sales of EAS equipment, has foreclosed a substantial percentage of the relevant markets to All-Tag and any other competitors for years at a time.

51.   Just counting recent transactions of which All-Tag is aware, Checkpoint has closed $20,000,000 of deals, as much as 40% of its current sales after spreading false and misleading claims or imposing anticompetitive conditions.

15

52.    On information and belief, customers also have signed up for these exclusive arrangements without informing All-Tag, so the true percentage of the RF label and tag markets foreclosed by Checkpoint's anticompetitive practices are higher than would be indicated by the instances known to All-Tag.

53.    Checkpoint's anticompetitive conduct and agreements – and the resulting foreclosure of much of the RF label markets to All-Tag and other competitors – has injured not only All-Tag, but also the customers in the RF label and tag markets, and ultimately the consumers who buy the merchandise.  All-Tag has lost customers and revenue, not because of competition on the merits, but because of anticompetitive conduct by a monopolist.  Customers are denied the choice of innovative RF labels and tags made by All-Tag and the competitive benefits of alternatives that are discouraged by Checkpoint's practices.

54.    The expected and intended effect of the predatory bundling and exclusive dealing will be to confine Checkpoint's competition to an ineffective fringe of constricted markets.  In the long run, the conduct poses a dangerous probability of forcing All-Tag and Checkpoint's other rivals out of the RF label and tag markets entirely, securing for Checkpoint an unthreatened monopoly.

**D.    Checkpoint's Rigged Studies and False Advertising**

55.    Checkpoint has a history of making fraudulent claims regarding All-Tag products, a practice that persists today.

### 1.   2004 Deceptive Marketing

56.     In 2004, All-Tag became aware that Checkpoint employees had been falsely claiming to customers that All-Tag labels and tags would not reliably deactivate (or turn off its antenna at checkout so that it would not respond to a sensor as the customer walked by).  On information and belief, Checkpoint also communicated with a major retailer customer, falsely blaming All-Tag's tags for failing to be detected when applied to a line of sunglasses sold in the retailer's stores.  Checkpoint knew that the issues arose because of the sunglass manufacturer's packaging error of placing a metallic label on the packaging where it interfered with the tag, and would have interfered with any RF tag.  All-Tag demanded that Checkpoint stop these deceptive claims and thought it had done so.

### 2.   2009 Deceptive Marketing

57.     In 2009, All-Tag learned that Checkpoint was falsely representing to retailers and source-taggers that All-Tag insert cards for Blu-Ray disc packages did not work, a representation that included a video demonstration featuring John Yurkovich, a Checkpoint employee, and posted on YouTube.  The demonstration purported to show that All-Tag's security tag, when affixed to a paper card inserted into a Blu-Ray case containing two discs, did not work, whereas Checkpoint's tag did work.  The demonstration was rigged, as it used an All-Tag card not intended for the specific disc packaging used in the demonstration, and thus produced false

results.  All-Tag demanded, in an October 19, 2009 letter to Checkpoint, that Checkpoint stop these deceptive claims and thought it had done so (the video was removed from YouTube).

### 3.   2010 Deceptive Marketing

58.    In 2010, All-Tag discovered that Checkpoint had been conducting so-called "audits" of All-Tag labels and tags for customers.  In these audits, Checkpoint representatives falsified the data on the performance of All-Tag products, telling customers that a substantial number of the All-Tag labels and tags failed.  All-Tag's own audits demonstrated that these failure rates were false.  All-Tag demanded, in letters sent in March 2010, that Checkpoint stop these deceptive practices and thought, based on Checkpoint's responses, that it had done so.

59.    All-Tag knew that these Checkpoint test results were false because of repeated independent testing that showed the quality of All-Tag labels to equal those of Checkpoint.  For example, in 2007, Procter & Gamble – a source-tagging customer of both All-Tag and Checkpoint with no incentive to play favorites – conducted a comparative evaluation of the two companies' labels.  As the study concluded, "The results demonstrated that RF labels from both brands perform properly when used within the guidelines established for minimizing static electricity in the application process."  P&G found that when properly applied, the frequency of "dead" labels (i.e., labels already deactivated by a static charge during

application) was closely comparable between the two brands, ranging from 0.95% to 1.95%.  An earlier study, of which Checkpoint was aware, conducted in 2006 by DVD insert printer Tahoe Southwest on 24,000 Checkpoint and All-Tag labels, had found that, "Both brands passed with a rate of over 99 percent live labels."

### 4.    2012 Fraudulent Comparative Study

60.    In or around late 2012 or early 2013, Checkpoint rolled out another deceptive marketing campaign against its competition.  This time the weapon was a rigged study commissioned by Checkpoint from a German company, TUV Rheinland, the company Checkpoint has used to test whether its products meet FCC regulatory requirements.  Checkpoint continues to promote this false study on its web site to this day.

61.    In its communications to customers, as on its web site, Checkpoint falsely holds out this study as an independent "third-party" test, when in fact, Checkpoint engineered it and retained a regular contractor to conduct it.  The study purportedly "evaluated RF labels from multiple manufacturers, measuring and comparing labels' application, detection, deactivation and reactivation."  The study's primary target was All-Tag.  Its labels were the first choice for most customers seeking an alternative to Checkpoint labels, and Checkpoint falsely stated in repeated communications to customers that All-Tag labels had lost in the test.

62.     Checkpoint described and showed the false study to customers starting in or around late 2012 or early 2013.  Checkpoint claimed that the results of the study showed, among other untrue things, that:  (1) when used with automatic application machines at the point of manufacture, All-Tag's labels were inadvertently deactivated 30% of the time, whereas Checkpoint's labels experienced only 1% unintended deactivation; (2) after being deactivated, All-Tag labels could accidently be reactivated up to 23% of the time, resulting in a false alarm when passing through the store gates, whereas Checkpoint's labels supposedly almost never reactivated; (3) All-Tag labels needed to be closer to the checkout deactivation pads than Checkpoint's in order to deactivate reliably; and (4) All-Tag labels were not as reliably detected by pedestals as Checkpoint labels. All are untrue.

63.     All of these claims are false and misleading.  Checkpoint has widely disseminated them.  Checkpoint has given copies of reports to customers, incorporated the false results in sales presentations, and otherwise described the study to customers, prospects, and the press.

64.     The false study was deliberately engineered to create an apparent disadvantage for All-Tag.  In the test of high-speed machine application, the study inappropriately used All-Tag's low-speed application labels, not the high-speed labels that would have been appropriate for the application.  Had the study tested

the correct All-Tag labels, it would have found no significant differences in the performances of the All-Tag labels compared to the Checkpoint labels.

### 5.     2017 Deceptive Marketing

65.     In 2017, Checkpoint has released a flurry of new marketing material, including the placement of purported review articles in trade publications, regarding what appears to be a second deceptive comparative study, purportedly completed in 2016.  For example, Checkpoint planted an article in the Labels & Labeling trade website citing "extensive TUV Rheinland testing" purportedly showing that "security labels from other manufacturers showed browning around the edges during microwaving, and in some cases caught fire during the process, making the product potentially unsafe for consumers."  In the March 2017 issue of Checkpoint's company magazine, which on information and belief Checkpoint distributes to actual and potential customers, Checkpoint printed an article headlined "Security Label Research Puts Checkpoint At Top Of The Class," claimed the following results with respect to Checkpoint's RF labels and tags:

- Checkpoint labels and tags "achieved the most consistent levels of detection;"

- Checkpoint "achieved the most consistent levels of deactivation with its products consecutively ranking in the top 5, with only two competitor products featuring in the top 10;"

21

- "Checkpoint RF labels were proven to have the lowest reactivation rates in the industry across the static testing, with only one competitor product achieving dynamic reactivation of less than 0.5 percent, compared to six of Checkpoint's products" and "[a]larmingly, more than half of the testing sample was shown to have a reactivation rate in excess of four percent when testing dynamic reactivation;"

- "Checkpoint's research revealed that up to 10 percent of competitor labels are 'killed' during the application process due to Electro Static Discharge – in addition to non-functioning labels found on delivered rolls" whereas "none of Checkpoint's labels were 'killed' during the application process."

66.     Customers to whom the false article is directed will understand and believe that the competitors referenced in the testing include All-Tag, Checkpoint's largest competitor in the RF label markets.  Moreover, Checkpoint specifically identifies All-Tag by name when presenting these results to customers.

67.     The claims made in Checkpoint's promotion of the purported research results are false.  ██████████████████████.  Testing commissioned by All-Tag verifies that All-Tag's RF labels perform as well as Checkpoint's products with respect to consistency of detection, consistency of deactivation, resistance to reactivation, and other important measures of performance.

22

68.    The published reports about the newer study, which Checkpoint promotes, resemble those about the 2012 study, which Checkpoint knows to be false.

69.    Checkpoint's false claims have had predictable and intended effects. In late 2016, a major customer of All-Tag agreed to approve All-Tag RF labels, both for source tagging by its suppliers and for self-tagging.  However, in early 2017, the customer stopped communicating with All-Tag and entered a label supply contract with Checkpoint.  In March 2017, All-Tag learned that Checkpoint had provided the customer with deceptive marketing materials relating to a comparative study by TUV.  The customer told All-Tag that the study concludes that 30% of All-Tag tags fail during mechanical application.  The claims are false and misleading, and Checkpoint knows it.  Such a failure rate cannot be found in any valid testing of All-Tag's labels.

70.    There is no basis for a claim that Checkpoint labels outperform All-Tag labels.  There is no basis for claims that tests show any such advantage. Competent and reliable comparative testing has consistently found All-Tag and Checkpoint labels to be consistent in performance.  All-Tag produces its labels under the direct supervision of its senior management and R&D staff in its facility in Florida, while Checkpoint produces many of its labels in China and other countries.

23

71.     Checkpoint's false advertising and deceptive representations about its own and competing RF labels and tags have harmed and continue to harm All-Tag, customers in the RF label and tag markets, and ultimately American consumers. Major customers have been confused and deceived by Checkpoint's misrepresentations.  Retailers and other customers who would otherwise have purchased All-Tag's low-cost, reliable products and passed the savings on to their customers, are deceived and induced to purchase less satisfactory theft protection products.

72.     All-Tag cannot be a viable competitor to Checkpoint when customers cannot trust All-Tag's products to perform their basic functions.  Checkpoint's false and misleading claims, published with knowledge of their falsity and understanding of their effect, can be explained only by an intention to eliminate All-Tag as a competitor.

73.     ███████████████████████████████████████
███████████████████████████████████████
███████████████████████

74.     ███████████████████████████████████████
███████████████████████████████████████
████████████████.

### E.    Checkpoint's Misappropriation of Trade Secrets

75.    Checkpoint has induced a former All-Tag employee to breach his contractual obligations to All-Tag and to provide Checkpoint with sensitive, proprietary and confidential business information about All-Tag.  Keith McUmber had been National Account Manager at All-Tag from September 14, 2009, through January 24, 2014.  McUmber was familiar with All-Tag's customer lists and contacts, priorities for which new customers to approach, and pricing and costs of RF labels and tags.

76.    The information that McUmber acquired in his position was protected by a confidentiality agreement he had signed as an All-Tag employee.  The agreement provided that he would not disclose, among other things, All-Tag vendor sources, marketing techniques and customer names to third parties, nor use them for personal benefit.  McUmber has knowledge of proprietary information about negotiations and transactions with many customers and prospects, the prices All-Tag would offer, the specialized services it would offer, the particular demands of the customers, and other information that he had no right to use after leaving All-Tag.

77.    Upon his departure, McUmber agreed in writing to continue to abide by the confidentiality agreement through and including January 24, 2019.

78.     When Checkpoint hired McUmber, it knew he was under obligations not to reveal All-Tag's proprietary information.  In 2016, Checkpoint designated him their Director of Source Tagging.

79.     In April 2017, ███████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████

80.     ██████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████

81.     ██████████████████████████████

███████████████████████████████████

82.     ████████████████████████████████

████████████████████████████████████████

██████

## V.    CAUSES OF ACTION

### COUNT I
### Monopolization, in Violation of Section 2 of the Sherman Act

83.    All-Tag incorporates by reference the allegations in Paragraphs 1 through 82 of this Complaint.

84.    One relevant product market comprises sales of radio frequency (RF) labels intended to be affixed to merchandise for electronic article surveillance (EAS) purposes in retail stores with installed bases of RF technology.  Other labels and tags (like AM labels and tags) do not work with RF equipment and vice versa. Thus, customers that have already invested in RF EAS systems must use RF labels and tags and have no interchangeable substitutes for the consumable RF labels that work with these systems.  Customers also could not respond to a small but significant non-transitory price increase in RF labels by switching to any alternative product because the cost of switching from an RF EAS system to another system (like AM) would be prohibitively expensive.  The relevant geographic market is the United States.

85.    Another relevant product market comprises sales of radio frequency (RF) labels intended to be affixed to merchandise for electronic article surveillance (EAS) purposes in drug stores, whether or not they have an installed base of EAS equipment.  Such stores have no alternative but to use RF technology if they want an EAS system at all because only RF labels and tags can be used with small items.

27

Customers could not respond to a small but significant non-transitory price increase in RF labels by switching to any alternative product because other labels and tags (like AM labels and tags) are too big and will not lay flat on small products.  The relevant geographic market is the United States.

86.     Another relevant market comprises sales of radio frequency (RF) labels intended to be affixed to merchandise for electronic article surveillance (EAS) purposes in grocery stores, whether or not they have an installed base of EAS equipment.  Such stores have no alternative but to use RF technology if they want an EAS system at all because only RF labels and tags can be used with small items.  Customers could not respond to a small but significant non-transitory price increase in RF labels by switching to any alternative product because other labels and tags (like AM labels and tags) are too big and will not lay flat on small products.  The relevant geographic market is the United States.

87.     Another relevant market comprises sales of radio frequency (RF) labels intended to be affixed to merchandise for electronic article surveillance (EAS) purposes in stores selling small items, such as books and sundries, whether or not they have an installed base of EAS equipment.  Such stores have no alternative but to use RF technology if they want an EAS system at all because only RF labels and tags can be used with small items.  Customers could not respond to a small but significant non-transitory price increase in RF labels by

28

switching to any alternative product because other labels and tags (like AM labels and tags) are too big and will not lay flat on small products. The relevant geographic market is the United States.

88.     Checkpoint possesses monopoly power in all the relevant markets.

89.     Through illegitimate means such as its exclusive dealing with retailers, manufacturers and packagers, combined with its predatory bundling of RF labels and tags with its RF-based EAS systems, its misrepresentations to customers, its misappropriation of trade secrets, Checkpoint has willfully acquired and maintains its monopoly power in the relevant markets through anticompetitive means, harming competition in the relevant markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

90.     All-Tag has been injured in its business and property by reason of Checkpoint's monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT II**
**Attempted Monopolization, in Violation of Section 2 of the Sherman Act**

91.     All-Tag incorporates by reference the allegations in Paragraphs 1 through 90 of this Complaint.

92.     The relevant markets are the same as those alleged in Count I.

93.     Checkpoint has a dangerous probability of achieving monopoly power in all the relevant markets.

94.     Through illegitimate means such as its exclusive dealing with retailers, manufacturers and packagers, combined with its predatory bundling of RF labels and tags with its RF-based EAS systems, its misrepresentations to customers, and its misappropriation of trade secrets, Checkpoint has acted with the specific intent to acquire and maintain monopoly power in relevant markets through anticompetitive means, harming competition in the relevant markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

95.     All-Tag has been injured in its business and property by reason of Checkpoint's attempt to monopolize the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT III**
**Agreements in Restraint of Trade, in Violation of**
**Section 1 of the Sherman Act**

96.     All-Tag incorporates by reference the allegations in Paragraphs 1 through 95 of this Complaint.

97.     The relevant markets are the same as those alleged in Count I.

98.     Checkpoint possesses monopoly power in all the relevant markets.

99.     Through illegitimate means such as its exclusive dealing with retailers, manufacturers and packagers, combined with its predatory bundling of RF labels and tags with its RF-based EAS systems, Checkpoint has entered into agreements with those retailers, manufactures and packages that unreasonably

restrain trade and foreclose competition in the relevant markets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

100.   All-Tag has been injured in its business and property by reason of these agreements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT IV
### False Advertising, in Violation of Section 43(a) of the Lanham Act

101.   All-Tag incorporates by reference the allegations in Paragraphs 1 through 100 of this Complaint.

102.   Checkpoint, in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities, of its RF labels and tags and those of All-Tag.

103.   These misrepresentations constitute false or misleading description of fact, or false or misleading representation of fact made in commerce in connection with the sale of goods and services, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

104.   All-Tag has been and continues to be damaged by Checkpoint's conduct in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT V
### Monopolization, in Violation of the Florida Antitrust Act

105.   All-Tag incorporates by reference the allegations in Paragraphs 1 through 104 of this Complaint.

31

106.   The relevant product markets are the same as those alleged in Count I. The relevant geographic market is Florida.

107.   Checkpoint possesses monopoly power in all the relevant markets.

108.   Through illegitimate means such as its exclusive dealing with retailers, manufacturers and packagers, combined with its predatory bundling of RF labels and tags with its RF-based EAS systems, its misrepresentations to customers, its coordination of customers, and its misappropriation of trade secrets, Checkpoint has willfully acquired and maintains its monopoly power in the RF label and tag markets through anticompetitive means, harming competition in the relevant markets, and has unlawfully monopolized trade or commerce in the markets in Florida as provided in Section 542.19, Fla. Stat. (2017).

109.   All-Tag has been injured in its business and property by reason of Checkpoint's monopolization of the relevant markets in violation of the Florida Antitrust Act, Section 542.19, Fla. Stat. (2017), and has standing to sue under Sections 542.22(1) and 542.23, Fla. Stat. (2017).

## COUNT VI
## Attempted Monopolization, in Violation of the Florida Antitrust Act

110.   All-Tag incorporates by reference the allegations in Paragraphs 1 through 109 of this Complaint.

111.   The relevant product markets are the same as those alleged in Count I.

112.   The relevant geographic market is Florida.

113.   Checkpoint has a dangerous probability of achieving monopoly power in the relevant markets.

114.   Through illegitimate means such as its exclusive dealing with retailers, manufacturers and packagers, combined with its predatory bundling of RF labels and tags with its RF-based EAS systems, its misrepresentations to customers, its coordination of customers, and its misappropriation of trade secrets, Checkpoint has acted with the specific intent to acquire and maintain monopoly power in the relevant product markets through anticompetitive means, harming competition in the relevant markets, and has unlawfully attempted to monopolize trade or commerce in the relevant markets as provided in the Florida Antitrust Act, Section 542.19, Fla. Stat. (2017).

115.   All-Tag has been injured in its business and property by reason of Checkpoint's attempt to monopolize the relevant markets in violation of the Florida Antitrust Act, Section 542.19, Fla. Stat. (2017), and has standing to sue under Sections 542.22(1) and 542.23, Fla. Stat. (2017).

## COUNT VII
## Unfair Competition Under Florida Common Law

116.   All-Tag incorporates by reference the allegations in Paragraphs 1 through 115 of this Complaint.

117.   All-Tag and Checkpoint are competitors in the sale of RF EAS labels or tags.

33

118.    Checkpoint has engaged in unfair, deceptive, and fraudulent conduct by, *inter alia*, its exclusionary agreements, its theft of trade secrets, its coordination of customers, and its false advertising.

119.    Checkpoint knew or should have known of the unfairness, deception and falsity of the aforementioned conduct and misrepresentations.

120.    Checkpoint intended that the misrepresentations and misappropriation of trade secrets would induce another to rely and act on them.

121.    Checkpoint's conduct and misrepresentations have caused, or are likely to cause, customer confusion and harm.

122.    All-Tag has been and continues to be injured and to suffer damages as a result of Checkpoint's unfair competition under Florida common law.

## COUNT VIII
## Misleading Advertising Under Fla. Stat. 817.41

123.    All-Tag incorporates by reference the allegations in Paragraphs 1 through 122 of this Complaint.

124.    Checkpoint has engaged in misleading advertising through its advertising and dissemination of false studies supposedly conducted by TUV Rheinland.

125.    Checkpoint has made false representations of material fact that it knew, or should have known, were false, including misrepresentations of the nature, characteristics, and qualities, of its RF labels and those of All-Tag.

34

126.   Checkpoint intended that the misrepresentations would induce another to rely and act on them.

127.   Checkpoint's misrepresentations were made with the intent or purpose, either directly or indirectly, of selling RF EAS labels or tags.

128.   Checkpoint's misrepresentations were made in bad faith and with malice or reckless indifference to All-Tag's and customers' interests.

129.   All-Tag has been and continues to be injured and to suffer damages as a result of Checkpoint's Misleading Advertising Under Fla. Stat. 817.41.

## VI.   PRAYER FOR RELIEF

WHEREFORE, All-Tag prays for relief as follows:

(1)   All appropriate injunctive relief, including prohibitions of the conduct described herein and rescission of exclusive tag and label supply terms in Checkpoint's RF supply contracts;

(2)   Threefold the damages sustained by All-Tag, attorney fees, filing fees and costs of suit under Section 4 of the Clayton Act, 15 U.S.C. § 15;

(3)   Injunctive relief and All-Tag's lost profits by reason of diversion of customers attributable to Checkpoint's false advertising in violation of Section 43(a) the Lanham Act, 15 U.S.C. § 1125(a), under Section 35 of the Lanham Act, 15 U.S.C. § 1117(a);

(4)    Injunctive relief, threefold the damages sustained by All-Tag, attorney fees, filing fees and costs of suit under the Florida Antitrust Act, Sections 542.22(1) and 542.23, Fla. Stat. (2017); and

(5)    Such other relief as the Court shall deem just and proper.

## VII.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, All-Tag demands a trial by jury on all issues so triable.

Dated:  June 21, 2019

Respectfully submitted,

*/s/ Christopher W. Kammerer*

KELLEY, DRYE & WARREN LLP
Matthew C. Luzadder, FBN #0011286
Julian Solotorovsky (*pro hac vice*)
333 W. Wacker Dr.
Chicago, IL 60606
312-857-7070
mluzadder@kelleydrye.com
jsolotorovsky@kelleydrye.com

William A. MacLeod (*pro hac vice*)
3050 K Street NW, Suite 400
Washington, DC 20007
202-342-8811
wmacleod@kelleydrye.com

Damon W. Suden (*pro hac vice*)
101 Park Avenue
New York, NY  10178
212-808-7528
dsuden@kelleydrye.com

36

WILLIAMS LOPATTO PLLC
John B. Williams (*pro hac vice*)
1707 L Street NW, Suite 550
Washington, DC 20036
202-296-1611
jbwilliams@williamslopatto.com

KAMMERER MARIANI PLLC
John F. Mariani
Christopher W. Kammerer
1601 Forum Place Suite 500,
West Palm Beach, FL 33401
561-990-1590
jmariani@kammerermariani.com
ckammerer@kammerermariani.com