**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| ALL-TAG CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 CV 81261-WPD |
| | ) | |
| v. | ) | Judge William P. Dimitrouleas |
| | ) | |
| CHECKPOINT SYSTEMS, INC., | ) | **HEARING REQUESTED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**CHECKPOINT SYSTEM, INC.'S MOTION FOR SUMMARY JUDGMENT
ON ALL-TAG CORP.'S SECOND AMENDED COMPLAINT
AND CHECKPOINT'S SECOND AND FIFTH AFFIRMATIVE DEFENSES
AND INCORPORATED MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

Table of Contents .................................................................................................................... i

Table of Authorities .............................................................................................................. iii

Introduction ............................................................................................................................1

Factual Background ................................................................................................................2

Memorandum of Law ..............................................................................................................2

I.   Standard of Review ..........................................................................................................2

II.  The Court Should Grant Summary Judgment On All-Tag's Antitrust Claims In
Counts I, II, III, V, And VI. ...........................................................................................2

    A.  All-Tag's Relevant Market Is Artificially Narrow Because It Intentionally
Excludes Checkpoint's Largest Competitor.................................................................3

    B.  Checkpoint Lacks Monopoly Power Because It Cannot Control Prices Or Exclude
Competition. ................................................................................................................6

        1.  All-Tag has no evidence that Checkpoint can raise prices by cutting its output
because it has shown no barriers to expansion. ....................................................7

        2.  All-Tag has no evidence that Checkpoint can exclude competitors because it
has shown no barriers to entry. ............................................................................8

    C.  Checkpoint Does Not Engage In Anticompetitive Conduct. .......................................9

        1.  All-Tag has no evidence that Checkpoint forces customers to enter exclusive
contracts.................................................................................................................9

        2.  All-Tag has no evidence that Checkpoint forces customers to accept its
bundled products..................................................................................................12

        3.  All-Tag has no evidence to meet the Eleventh Circuit's high bar for
considering misrepresentations as anticompetitive conduct. ..............................16

        4.  Misappropriation of trade secrets is a business tort, not an antitrust violation. ....19

    D.  All-Tag Cannot Show Harm To Competition. .........................................................20

        1.  All-Tag cannot demonstrate substantial foreclosure through exclusive
contracts and bundled discounts. ........................................................................20

        2.  All-Tag has no facts linking Checkpoint's conduct to harm to competition:
reduced output, increased prices, or deterioration in quality...............................21

III. The Court Should Grant Summary Judgment On All-Tag's False Advertising And
Unfair Competition Claims In Counts IV, VII, And VIII. ............................................23

    A.  All-Tag Has No Evidence To Overcome The Laches Presumption For Statements
Made Nearly A Decade Ago Or Any Evidence To Otherwise Support The Claims. .24

    B.  All-Tag Cannot Assert That Checkpoint's Advertising Is Misleading Because All-
Tag Has No Evidence Of Customer Deception........................................................24

C.  All-Tag Cannot Meet Its Affirmative Burden Of Showing That Checkpoint's Marketing Of Comparative Testing Does Not Establish The Propositions For Which They Are Cited. ...........................................................................................25

D.  All-Tag Has No Evidence That Checkpoint's Advertising Materially Influenced Customers' Purchasing Decisions. ...........................................................................26

E.  All-Tag Has No Evidence Linking Any Of The Advertising To Damages It Alleges It Has Suffered. ......................................................................................28

IV. The Court Should Grant Summary Judgment On Checkpoint's Affirmative Defenses....30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3M Innovative Properties Co. v. Dupont Dow Elastomers LLC*,
   361 F. Supp. 2d 958 (D. Minn. 2005) ....................................................................29

*Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*,
   849 F.2d 1336 (11th Cir. 1987) .............................................................................2

*Air Turbine Tech., Inc. v. Atlas Copco AB*,
   295 F. Supp. 2d 1334 (S.D. Fla. 2003) ..................................................................28

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
   391 F. Supp. 2d 1148 (S.D. Fla. 2005).................................................................25

*Am. Key Corp. v. Cole Nat'l Corp.*,
   762 F.2d 1569 (11th Cir. 1985) .................................................................3, 6, 20

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns., Inc.*,
   108 F.3d 1147 (9th Cir. 1997) ..............................................................................17

*AmBrit, Inc. v. Kraft, Inc.*,
   812 F.2d 1531 (11th Cir. 1986) ............................................................................24

*Amerinet, Inc. v. Xerox Corp.*,
   872 F.2d 1483 (8th Cir. 1992) ..............................................................................11

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
   145 F.3d 1258 (11th Cir. 1998) .....................................................................10, 18

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins. Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ...............................................................................8

*Barry Wright Corp. v. ITT Grinnell Corp.*,
   724 F.2d 227 (1st Cir. 1983)..................................................................................12

*Border Collie Rescue, Inc. v. Ryan*,
   418 F. Supp. 2d 1330 (M.D. Fla. 2006) ...............................................................25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).............................................................................................19

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)...........................................................................................3, 4

*Brown v. Armstrong*,
   957 F. Supp. 1293 (D. Mass 1997.) ....................................................................29

*Burndy Corp. v. Teledyne Indus., Inc.*,
   748 F.2d 767 (2d Cir. 1984) .................................................................................29

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) .........................................................................11, 13

*CDC Techs., Inc. v. IDEXX Labs., Inc.*,
   186 F.3d 74 (2d Cir. 1999) .....................................................................................7

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................2

*Chapman v. New York State Div. for Youth,*
    546 F.3d 230 (2d Cir. 2008) ....................................................................3

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) .................................................................8

*Cross Country Home Servs., Inc. v. Home Serv. USA Corp.,*
    No. 08-61456, 2010 WL 331752 (S.D. Fla. Jan. 20, 2010) ...................24

*Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.,*
    797 F.3d 1248 (11th Cir. 2015) ............................................. 5, 6, 7, 16

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.,*
    357 F.3d 1 (1st Cir. 2004) ..................................................................8, 20

*E.T. Barwick Indus., Inc v. Walter E. Heller & Co.,*
    692 F. Supp. 1331 (N.D. Ga. 1987) ......................................................21

*Farnell v. Albuquerque Publ'g Co.,*
    589 F.2d 497 (10th Cir. 1978) ................................................................2

*Fifth Third Bank v. Alaedin & Majdi Invs., Inc.,*
    No. 11-cv-2206, 2012 WL 1137104 (M.D. Florida 2012)....................30

*Hickson Corp. v. N. Crossarm Co.,*
    357 F.3d 1256 (11th Cir. 2004) .............................................................25

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.,*
    864 F.2d 1409 (7th Cir. 1989) ................................................................8

*Inmuno Vital, Inc. v. Golden Sun, Inc.,*
    49 F. Supp. 2d 1344 (S.D. Fla. 1997) ...................................................25

*Int'l Stamp Art, Inc. v. U.S. Postal Serv.,*
    456 F.3d 1270 (11th Cir. 2006) .............................................................30

*Invacare Corp. v. Respironics, Inc.,*
    No. 04 CV 1580, 2006 WL 3022968 (N.D. Ohio Oct. 23, 2006)..........14

*IQ Prods., Co. v. Pennzoil Prods., Co.,*
    305 F.3d 368 (5th Cir. 2002) ................................................................28

*It's My Party, Inc. v. Live Nation, Inc.,*
    811 F.3d 676 (4th Cir. 2016) ....................................................5, 10, 11

*Jacobs v. Tempur-Pedic Int'l, Inc.,*
    626 F.3d 1327 (11th Cir. 2010) ......................................................passim

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984)....................................................................................20

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.,*
    299 F.3d 1242 (11th Cir. 2002) ......................................................passim

*L.H. Equity Invs., LLC v. Wade*,
    No. 09-80607, 2010 WL 11505176 (S.D. Fla. Mar. 29, 2010) ...................................................3

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
    72 F.3d 1538 (11th Cir. 1996) ...................................................5

*Marts v. Xerox, Inc.*,
    77 F.3d 1109 (8th Cir. 1996) ...................................................13

*Mazda v. Carfax, Inc.*,
    No. 13-cv-2680, 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016)...................................................11

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ...................................................23

*Mfg. Research Corp. v. Greenlee Tool Co.*,
    693 F.2d 1037 (11th Cir. 1982) ...................................................21

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
    745 F. Supp. 2d 1359 (S.D. Fla. 2010)...................................................24

*Monitor Bus. Machines, Inc. v. Am. Tel. & Tel. Co.*,
    No. CV 76-1423, 1978 WL 1336 (C.D. Cal. May 5, 1978)...................................................19

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997) ...................................................26

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)...................................................22

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ...................................................10

*Ostrofe v. H.S. Crocker Co.*,
    740 F.2d 739 (9th Cir. 1984) ...................................................19

*Premier Comp Sols. LLC v. UPMC*,
    377 F. Supp. 3d 506 (W.D. Pa. 2019) ...................................................19

*Procaps S.A. v. Patheon Inc.*,
    141 F. Supp. 3d 1246 (S.D. Fla. 2015)...................................................2, 20

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...................................................7

*Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*,
    49 F. Supp. 3d 385 (S.D.N.Y. 2014)...................................................17, 18, 19

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ...................................................18

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ...................................................26

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ...................................................18

*Smith v. Mellon Bank*,
  957 F.2d 856 (11th Cir. 1992) ................................................................23

*Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*,
  702 F.3d 1279 (11th Cir. 2012) ..............................................................23

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
  376 F.3d 1065 (11th Cir. 2004) .........................................................passim

*Sterling Merchandising, Inc. v. Nestle, S.A.*,
  656 F.3d 112 (1st Cir. 2011).................................................................21

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) ...................................................................21

*Suntree Techs., Inc. v. Ecosense Int'l, Inc.*,
  693 F.3d 1338 (11th Cir. 2012) ..............................................................23

*Suture Express, Inc. v. Owens & Minor Distribution, Inc.*,
  851 F.3d 1029 (10th Cir. 2017) ................................................................7

*T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*,
  931 F.2d 816 (11th Cir. 1991) ..................................................................3

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)......................................................................10, 20

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) .......................................................................7

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
  7 F.3d 986 (11th Cir. 1993) .................................................................3, 7

*United States v. E.I. duPont de Nemours & Co.*,
  351 U.S. 377 (1956)..................................................................................6

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965)..................................................................................3

*Watts v. Butte School Dist.*,
  939 F. Supp. 1418 (D. Neb. 1996) ..........................................................30

*Will v. Comprehensive Accounting Corp.*,
  776 F.2d 665 (7th Cir. 1985) ..................................................................10

**Treatises**

Herbert Hovenkamp & Erik Hovenkamp, *Complex Bundled Discounts and Antitrust Policy*,
  57 Buff. L. Rev. 1227 (2009) ..................................................................14

IIIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2008)..............................16

Defendant Checkpoint Systems, Inc. ("Checkpoint") respectfully moves for summary judgment on All-Tag Corp.'s ("All-Tag") Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 56 and L.R. 56.1.  In support of this Motion, Checkpoint submits its Statement of Material Facts and incorporated Memorandum of Law.

## **INTRODUCTION**

Simply put, All-Tag cannot create a genuine issue of fact to survive summary judgment because it has no evidence from customers to support its antitrust and false advertising claims.  In fact, the evidence from customers directly refutes All-Tag's allegations.  All-Tag attempts to gerrymander the relevant market by intentionally excluding Checkpoint's principal competitor—even though customers themselves have testified that they ███████████████████████████ █████████████████. All-Tag claims that Checkpoint has "coerced" customers into agreeing to exclusive contracts by offering bundled discounts that competitors cannot match.  But All-Tag identifies ██████████████████████████████████████████████ ███████████████████████████████████████. ████████████████ ████████████████████████████████████████████████████████ ██████████████████. Moreover, the customers, themselves, have explicitly testified █████████ ████████ They testified they ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Not a single customer has testified that they ███████████ ████████████████████████████████████████████████████████████ █████████

All-Tag also cannot manufacture a genuine issue of material fact on its false advertising claims.  Again, All-Tag has no evidence ██████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ ███████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████.

Moreover, All-Tag has **no** evidence on causation and damages—both of which are material elements for its false advertising claims.

Even if All-Tag could present a material issue of fact on any of its claims, they would be barred by Checkpoint's Second and Fifth Affirmative Defenses of waiver, estoppel, and release.

███████████████████████████████████████████

██████████

Accordingly, the Court must grant summary judgment on all of the claims in All-Tag's Second Amended Complaint.

## FACTUAL BACKGROUND

Checkpoint incorporates by references its Statement of Material Facts (hereinafter "SOF ¶ __") filed with this Motion pursuant to Local Rule 56.1(a).

## MEMORANDUM OF LAW

### I.   STANDARD OF REVIEW

Rule 56(c) mandates summary judgment when the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-movant cannot defeat summary judgment by: (a) resting upon mere allegations or denials; (b) simply saying the facts are in dispute; or (c) relying on evidence that is merely colorable or not significantly probative. *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1260 (S.D. Fla. 2015). Summary judgment can "avoid needless trial" especially "in the area of anti-trust litigation where the complex nature of the subject matter mandates that, absent a valid claim, defendants be protected against the heavy burden of expense and effort entailed in a protracted and intricate trial." *Farnell v. Albuquerque Publ'g Co.*, 589 F.2d 497, 502 (10th Cir. 1978); *see Procaps S.A.*, 141 F. Supp. 3d at 1260 ("Courts regularly grant summary judgment in antitrust cases.").

### II.  THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ALL-TAG'S ANTITRUST CLAIMS IN COUNTS I, II, III, V, AND VI.

All-Tag's claims under Sections 1 and 2 of the Sherman Act, and its claims under the Florida Antitrust Act, are all premised on Checkpoint (1) possessing "monopoly power in all the relevant markets" (or, for attempted monopolization, having a "dangerous probability" of achieving monopoly power) and (2) using "illegitimate means" to acquire and maintain its monopoly power.[1]   (Second Amended Complaint ("SAC"), filed redacted at DE 177 and unredacted under seal at DE 180, ¶¶ 88-89 (Count I), ¶¶ 93-94 (Count II), ¶¶ 98-99 (Count III), ¶¶

---

[1] All-Tag's claims under the Florida Antitrust Act (Counts V and VI) are subject to the same analysis as its claims under § 2 of the Sherman Act. *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1341 (11th Cir. 1987).

107-108 (Count V), ¶¶ 113-114 (Count VI)).  The antitrust claims also require that All-Tag prove harm to competition (rather than simply damage to an individual competitor) within a "distinct" relevant market.  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1074 (11th Cir. 2004).  Thus, to succeed on its antitrust claims All-Tag must: (1) define a distinct relevant market; (2) prove that Checkpoint has monopoly power in that market; (3) prove that Checkpoint acquired its monopoly power through illegitimate means; and (4) prove that Checkpoint's conduct harmed competition as a whole rather than just All-Tag itself.

As set forth below, Checkpoint is entitled to summary judgment on All-Tag's antitrust claims because no genuine issue of material fact exists that (1) All-Tag's purported relevant market is artificially narrow because it intentionally excludes Checkpoint's primary competitor; (2) Checkpoint lacks monopoly power in any relevant market; (3) Checkpoint did not engage in any anticompetitive conduct; and (4) Checkpoint did not cause any harm to competition.

### A. All-Tag's Relevant Market Is Artificially Narrow Because It Intentionally Excludes Checkpoint's Largest Competitor.

"Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case."  *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the] market there is no way to measure [a defendant's] ability to lessen or destroy competition.").  Failure to produce admissible evidence supporting a cognizable market is grounds for summary judgment.  *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 (11th Cir. 1985).  As the Eleventh Circuit succinctly stated in *T. Harris Young*, "Where there is no Market, there is no Monopoly."  *T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991).

A product market is determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  An alleged relevant market that artificially defines the relevant market to create the appearance of market power without including all interchangeable substitute products is insufficient as a matter of law.  *See L.H. Equity Invs., LLC v. Wade*, No. 09-80607, 2010 WL 11505176, at *3 (S.D. Fla. Mar. 29, 2010); *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 237-38 (2d Cir. 2008).

Here, All-Tag artificially draws relevant markets that create the appearance of Checkpoint's monopoly power only by excluding Checkpoint's largest EAS[2] competitor: Sensormatic. There can be no dispute of fact that █████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████[3] (SOF ¶¶ 12-13.) █████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████ (SOF ¶ 12.)

As the Supreme Court noted 50 years ago, relevant product markets must "be drawn with sufficient breadth to including competing products…and to recognize competition where, in fact, competition exists." *Brown Shoe Co.*, 370 U.S. at 327. Here, Checkpoint publicly identifies Sensormatic in SEC filings as its "principal global competitor in the EAS industry" and ████████████████████████████████████████████████████. (SOF ¶ 13.) It is undisputed that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████ (SOF ¶ 14.)

Despite this, All-Tag proposes a relevant market limited to "RF labels and tags sold to retailers with RF EAS systems already installed"—*i.e.*, one that by construction excludes ████████████████████████████████████████████████████████████████████████████████ █████████████████[4] (SAC ¶ 36.) All-Tag's justification for excluding Sensormatic is that (1) certain customers prefer Checkpoint's RF technology over Sensormatic's AM technology based on feature differences between the two; and (2) once customers have chosen RF technology the switching costs are too great to choose another technology. All-Tag makes these conclusory assertions ***without evidence from a single customer***. No customer has testified that feature

---

[2] ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ (SOF ¶ 2.)

[3] Sensormatic's customers include ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ █████████████████████████████. (SOF ¶ 14.)

[4] To be clear, All-Tag alleges that there are separate markets for RF pedestals and RF labels since a customer can purchase pedestals from one competitor and labels from another. ██████████████ ████████████████████████████████████████████████████████████████████████████(SOF ¶ 4.) Regardless, All-Tag alleges that Checkpoint has monopoly power in both markets.

preferences render Sensormatic's products unacceptable substitutes for Checkpoint's products or that "switching costs" take Sensormatic out of the market. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1553 (11th Cir. 1996) (dismissing claim based on inadequate market definition where plaintiff "offered no evidence to show that the cost to the enrollee of switching to another healthcare plan would be prohibitively expensive").

Not only does All-Tag lack any evidence to support its theory, the evidence ***directly from customers*** expressly refutes it. That evidence shows that ███████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ (*See* SOF ¶¶ 32, 53.) *See Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015) (competitors which have the ability—actual or potential—to take significant amounts of business away from each other are in the same product market). For example, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ (SOF ¶ 33.) ***Not a single customer has testified to the contrary***. Moreover, many of Checkpoint's current customers—████████████████████████████████ ████—formerly used Sensormatic AM EAS and switched to Checkpoint's RF EAS. (SOF ¶¶ 25, 30, 45, 57.) All-Tag cannot refute actual facts with groundless speculation to create a genuine issue of material fact.

Accepting All-Tag's relevant market definitions would require ignoring the actual undisputed evidence from customers regarding what products ***customers*** believe are reasonable substitutes. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337–38 (11th Cir. 2010) ("A court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because if consumers view the products as substitutes, the products are part of the same market.") (internal quotation omitted). As the court explained in *It's My Party*, "[n]o party can expect to gerrymander its way to an antitrust victory without due regard for market realities." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016). Yet, that is exactly what All-Tag attempts to do by excluding Sensormatic. Under All-Tag's definition, if a customer deciding between Checkpoint and Sensormatic chose Checkpoint (such as ██████ ██████████████████), they are *in* the relevant market. Yet, if that same customer chose Sensormatic (such as ████████████████████████), they are *outside* the relevant market.

Under All-Tag's theory, customers like ████████████████████████ are outside the relevant market while they are using Sensormatic but suddenly are in the relevant market once they use Checkpoint.[5]   As All-Tag's own expert Patrick O'Leary testified, █████████████████ ████████████████████████████████ (SOF ¶ 67.)  The reason: ██████ ███████████████████████████████████████████ ███████████████████ (*Id.*)  And as Sensormatic describes, ██████████ ███████████████████████████████████████████ ████████████████████████ (SOF ¶ 13.)  Excluding a primary competitor like Sensormatic creates an ***appearance*** of market share and monopoly power, but is not based on market realities, active competition, and actual substitutes.  Based solely on the deficiency of All-Tag's gerrymandered market definition, summary judgment should enter.

**B. Checkpoint Lacks Monopoly Power Because It Cannot Control Prices Or Exclude Competition.**

Even if All-Tag could legitimately exclude Sensormatic from the real-world market in which Checkpoint and All-Tag compete, All-Tag cannot show that Checkpoint has "monopoly power" in a RF-only label market.  Monopoly power is the power to (1) raise prices to supra-competitive levels or (2) exclude competition in the relevant market by restricting entry of new competitors or driving existing competitors out of the market.  *Duty Free Ams., Inc.*, 797 F.3d at 1264; *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  Summary judgment must enter where, as here, All-Tag lacks evidence that Checkpoint can control prices or exclude competition.  *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir. 1985).

██████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████market share alone is insufficient to show monopoly power unless All-Tag proves that Checkpoint can ***use*** its alleged market share to raise prices or exclude competition.  *Jacobs*, 626 F.3d at 1340 ("[B]eyond [alleging defendant has 80-90% of sales in the market], the complaint provides no direct evidence of the injurious exercise of market power such

---

[5] ███████████████████████████████████ ███████████████████████████████████████████ ██████████

as evidence of restricted output and supracompetitive prices.") (internal quotation omitted); *Duty Free Ams., Inc.*, 797 F.3d at 1270 ("[I]t is not enough for DFA to allege that Estée Lauder is the top supplier of duty free beauty products.  DFA was required to link that fact to a competitive harm."); *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 81 (2d Cir. 1999) ("[E]ven assuming that CDC's market share were sufficient to create a triable issue as to market power, CDC's claim could not withstand summary judgment.  A showing of market power, while necessary to show adverse effect indirectly, is not sufficient.") (quotation omitted); *Suture Express, Inc. v. Owens & Minor Distribution, Inc.*, 851 F.3d 1029, 1042 (10th Cir. 2017) ("[M]arket share alone is insufficient to establish market power") (quotation omitted); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) ("On this record we can draw no reasonable inference other than that Quality lacks monopoly power.  Despite its high market share, no other evidence…supports the conclusion that Quality can control prices or exclude competition…"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme.  The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price.").  Here, no genuine dispute of material fact exists that irrespective of "market share," Checkpoint cannot control prices or exclude competitors.  It cannot prevent competitors from expanding their output (there are no barriers to expansion) and it cannot prevent new rivals from entering the market (there are no barriers to entry).

>   **1.   All-Tag has no evidence that Checkpoint can raise prices by cutting its output because it has shown no barriers to expansion.**

A company with monopoly power can use its market share to control market-wide prices by simply cutting its own output. *U.S. Anchor Mfg., Inc.*, 7 F.3d at 995–96. When such a company cuts its own output, it has such a dramatic effect on the output of the market as a whole that market-wide prices go up.  All-Tag has no evidence that Checkpoint wields such power.  All-Tag's SAC makes no allegations regarding a reduction in total market output and no evidence supports such a claim.  Rather, All-Tag's claim is simply that but for the alleged conduct, All-Tag would have made certain sales instead of Checkpoint.  This type of one-for-one claim has nothing do to with market-wide reductions in output and is the reason why, as set forth below, antitrust law is concerned with harm to competition, not harm to competitors.

Although All-Tag alleges that Checkpoint has been a monopolist for "over forty years" (SAC ¶ 3), it has no evidence that Checkpoint has *ever* exercised monopoly power by cutting its output—let alone done so to increase market-wide prices.  Even if Checkpoint did cut its own output, there is no evidence that such action would have any effect on *market-wide* output.  Indeed, All-Tag testified ████████████████████████████████████████████████████████ ██████████████████████████ (SOF ¶ 11.) ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████  (SOF ¶¶ 11, 21-23.)  As the Seventh Circuit held in *Indiana Grocery, Inc.*, it would be inconsequential if Kroger withheld groceries sold to consumers in an effort to drive up the price.  *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989).  New or existing competitors could easily offset that action by importing more food from suppliers.  *Id.* Accordingly, "Kroger or any competitor would probably have little success in attempting to curtail total market output." *Id.*  The same applies here. ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████

## 2. All-Tag has no evidence that Checkpoint can exclude competitors because it has shown no barriers to entry.

Courts consistently hold that even a firm with high market share cannot exclude competitors if barriers to entry are low because new companies can easily enter the market to challenge the dominant firm.  *See E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 6 (1st Cir. 2004) (market power cannot be inferred from high market share if entry barriers to market are low); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (antitrust claims insufficient as a matter of law where no evidence of significant barriers to entry); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins. Inc.*, 784 F.2d 1325, 1334-37 (7th Cir. 1986) (market share does not indicate market power because new firms can enter easily or existing firms can expand their sales quickly).

██████████████████████████████████████████████████████ ████████████████████  (*See* SOF ¶ 80.)  As noted above (and as described in *Indiana Grocery*), companies such as ██████████████████████████████████████████████ █████████████████████████████████ (SOF ¶¶ 21-23.)  All-Tag, itself, ████████

8



(SOF ¶ 10.) ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SOF ¶¶ 21-23.)  While the SAC alleges that RF label manufacturing equipment "raises barriers to entry" (SAC ¶ 41) label distributors such as ▮▮▮▮▮▮▮▮ face no such challenge.  And while the SAC alleges that foreign suppliers are not practical alternatives because of shipping costs, lack of a distribution network, and customer service (SAC ¶ 38), All-Tag has no evidence to support those assertions.  All-Tag's ▮▮▮▮▮▮▮▮▮▮ refutes the idea that things like shipping costs constitute a barrier to entry.  In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ (SOF ¶ 23.)

Because the indisputable evidence shows the absence of significant barriers to entry for new market entrants, All-Tag's claims that Checkpoint can exclude competitors from the market must fail.

### C. Checkpoint Does Not Engage In Anticompetitive Conduct.

Even if All-Tag could show Checkpoint had the power to control prices and exclude competitors, the law does not make simply having monopoly power, itself, illegal.  Rather, All-Tag must prove that Checkpoint engaged in anticompetitive conduct.  *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1075 ("Regardless of the defendant's power or intent, its conduct may be incapable of producing monopoly…").

The SAC alleges four types of conduct by Checkpoint: (1) exclusive contracts with customers; (2) discounts on bundles selling EAS systems and labels together; (3) misrepresentations to customers; and (4) misappropriation of trade secrets.  As set forth below, All-Tag cannot raise a genuine issue of material fact demonstrating that any of this constitutes anticompetitive conduct, either individually or together.

#### 1. All-Tag has no evidence that Checkpoint forces customers to enter exclusive contracts.

All-Tag alleges that "Checkpoint uses its unique position [as a one-stop provider of integrated and complete solutions for retailers] to extract customer commitments to making Checkpoint the exclusive supplier of RF labels and tags."  (SAC ¶ 42.)  In other words, All-

Tag asserts that Checkpoint forces customers to enter exclusive label contracts in order to purchase EAS hardware and services that they could not otherwise obtain elsewhere.  (*See* SAC ¶ 5.)

To show such an illegal tying arrangement, All-Tag would have to show that Checkpoint exploited its control over EAS systems "in order to *force*" customers to purchase RF labels "which they either did not want or might have preferred to purchase elsewhere."  *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1263 (11th Cir. 1998) (emphasis in original).  As the Eleventh Circuit noted in *Aquatherm*, "[t]he flaw in this argument is that the essential element of coercion on the part of the product seller is absent completely from the facts presented."  *Id.* at 1262; *It's My Party, Inc.*, 811 F.3d at 684 ("If instead the buyer is free to decline the tied product or to purchase the two products separately, then by definition there is no unlawful tying."); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 670 (7th Cir. 1985) (the "voluntary purchase of two products together" is "not a tie at all").  All-Tag cannot show Checkpoint forced customers into exclusive contracts for four separate reasons.



**First**, All-Tag concedes that ██████████████████████████ ██████████████████████████ (SOF ¶ 78.) ██████████████████ ██████████████████████████ ██████████████ (*Id.*)  Obviously if these customers had no exclusive contract then Checkpoint did not (and could not) force them to enter one.

**Second**, for the ██████████████████████████ ██████████████████████████ (SOF ¶¶ 34, 39-40, 47, 54, 79.)  Yet, ██████████████████████████ ██████████████████████████ (SOF ¶¶ 78.)  In actuality, ██████████████████ ██████████████████████████ ██████████████ (SOF ¶ 79.) ██████████████████████████ ██████████████████████████ .  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) ("[T]he opportunities for other traders to enter into or remain in that market must be significantly limited."); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) ("Because *all* of Gilbarco's distributors are available within one year, and *most*…are available on 60 days notice, a competing manufacturer need only offer a better product or a better

deal to acquire their services."); *Mazda v. Carfax, Inc.*, No. 13-cv-2680, 2016 WL 7231941, at \*5 (S.D.N.Y. Dec. 9, 2016) (no threat to competition because when exclusive contracts expire, "a firm's rivals can bid to take over the contract").

***Third***, ██████████████████████████████████ All-Tag has no evidence that Checkpoint ***forced*** these customers to purchase RF labels which they either did not want or might have preferred to purchase elsewhere.  Not a single customer has testified that they did not want to purchase RF labels from Checkpoint, or that they would have preferred to purchase RF labels from All-Tag, but could not.  To the contrary, customers like ██████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████. (SOF ¶¶ 27, 35, 40-41, 48, 53, 56.)  Customers have testified that ██████████████████████████████████████████ (SOF ¶¶ 35, 41, 50.)  "[I]f pure speculation by a competitor were enough to prove the opposite of what consumers describe is happening in the market, then antitrust defendants should surrender every time a rival files a complaint."  *It's My Party, Inc.*, 811 F.3d at 685.

***Fourth***, since All-Tag has no evidence that Checkpoint ***forced*** customers to agree to exclusive label contracts, it theorizes that ████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████ (SOF ¶ 78.)

---

[6] The discount attribution test is a mechanism for showing that a given discount on a bundle of products makes it the "only viable economic option" for purchasers.  *See Amerinet, Inc. v. Xerox Corp.*, 872 F.2d 1483, 1500-01 (8th Cir. 1992) (dismissing claim where there was no indication it was unfeasible to purchase products separately).  If the bundled discounts "pass" a discount attribution test, the discounts are considered above cost and not anticompetitive.  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008) ("[E]xclusionary conduct element…cannot be satisfied by reference to bundled discounts unless the discounts result in prices that are below an appropriate measure of the defendant's costs.").

What this means is that All-Tag does not—and cannot—assert that ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Because Checkpoint's contracts were not exclusionary and All-Tag and others had the opportunity to compete for the contracts, All-Tag cannot prove that the competitors were prevented from entering into or remaining in the market.[9]

> **2.   All-Tag has no evidence that Checkpoint forces customers to accept its bundled products.**

Dr. Hunter identified ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

---

[7] Dr. Hunter ████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████

[8] Moreover, while All-Tag claims ██████████████████████████████████
████████████████████████████████████████████████

[9] If conduct is not "exclusionary," for purposes of Section 2 of the Sherman act, then it also cannot be an "unreasonable" restraint of trade under Section 1.  *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 239 (1st Cir. 1983).  As discussed below, even by All-Tag's own numbers, less than 25% of Checkpoint's sales could be foreclosed by exclusive contracts and bundled discounts.

As Dr. Hunter admitted, ███████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████ As the Ninth

Circuit stated in *Cascade Health*, these types of bundled discounts "benefit buyers because the discounts allow the buyer to get more for less." *Cascade Health Sols.,* 515 F.3d at 895; *see also Amerinet, Inc.*, 972 F.2d at 1500-01 (dismissing claim where there was no indication it was unfeasible to purchase products separately). Thus, there is no genuine issue of fact that ███
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████

For the ██████████████████████████████████████████████
████████████████████████████████████████████████████

█████████ All-Tag's claims that Checkpoint engaged in anticompetitive conduct to obtain the exclusive contracts fails for two reasons.

**First**, All-Tag has no evidence that Checkpoint **conditioned** the hardware discounts on exclusive label purchases. *See Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) ("[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."); *see also Cascade Health Sols.*, 515 F.3d at 900. ██████████████████████████████████████████████████████
███████████████████████████ (SOF ¶¶ 34, 40.) █████████████████████
████████████████████████████████████████████████████████

- ████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████

- ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

13

███████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████ (SOF ¶¶ 52-53.)  Quite the opposite. ████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████

      ***Second***, even if Checkpoint had conditioned hardware discounts on exclusive label purchases, customers could not have been "coerced" into purchasing the discounted bundle from Checkpoint because there is no genuine issue of fact that ████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████  *See Invacare Corp. v. Respironics, Inc.*, No. 04 CV 1580, 2006 WL 3022968, at *12 (N.D. Ohio Oct. 23, 2006) ("[W]here there are competing firms that can match the bundle, a finding that Defendant's bundling practice was anticompetitive could end up 'requir[ing] businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business.'") (quoting *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 470 (S.D.N.Y. 1996)); *see also* Herbert Hovenkamp & Erik Hovenkamp, *Complex Bundled Discounts and Antitrust Policy*, 57 Buff. L. Rev. 1227, 1231 (2009) (where even a group of rivals collectively can offer the bundle, there is no occasion to apply the discount attribution test).

---

10 ███████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████
11 █████████████████████████████████████████████████ ████████████████████████████████████

Again, the undisputed evidence is that not only 

All-Tag's arguments cannot be reconciled with the evidence from customers themselves and the evidence of actual competition for the business of these customers.

### 3.   All-Tag has no evidence to meet the Eleventh Circuit's high bar for considering misrepresentations as anticompetitive conduct.

Because All-Tag cannot show market-wide foreclosure through exclusive contracts and bundled discounts, it attempts to use alleged false advertising as a stopgap to plug the holes in its theory.  In other words, All-Tag claims that if a customer did not purchase from All-Tag because of Checkpoint's exclusive contracts and bundled discounts, then it must have been "coerced" to purchase from Checkpoint because of Checkpoint's advertising.   This claim cannot survive summary judgment.  Advertising cannot **prevent** individual customers from purchasing from All-Tag—let alone **foreclose** a market.

Under Eleventh Circuit law, "[d]isparagement is rarely a basis for finding attempted monopolization under § 2, because even false statements about a single competitor often do not meet the requisite standard of generating harm to competition."  *Duty Free Ams., Inc.*, 797 F.3d at 1269.  As the Eleventh Circuit explained, "when a defendant makes false statements—**even clearly false statements**—about a competitor, 'these…practices might be characterized as unsavory, or even illegal under other laws,' but 'they do not give rise to a federal antitrust claim without factual allegations specifically addressing how these practices have harmed competition.'"  *Id.* (emphasis added, quoting *Spanish Broad. Sys. Of Fla., Inc.*, 376 F.3d at 1076-77.)  In *Duty Free Americas, Inc.*, the Eleventh Circuit recognized that because of this, sister circuits "have adopted a **presumption** that misrepresentations or false statements about a competitor have a **de minimis** effect on competition."  *Id.* (emphasis added, citing cases from the 2nd, 6th, 7th, 9th, and 10th Circuits).

While the Eleventh Circuit has not had the opportunity to express whether the *de minimus* presumption applies in this Circuit, it has found at least the following factors relevant: whether the statements were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals.  *Id.*  Notably, both the *de minimus* presumption, and the six-factor test, are in accord with the views of the leading antitrust treatise.  IIIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 782b (3d ed. 2008) ("[C]ourts would be wise to regard misrepresentations as presumptively *de minimis* for §2 purposes.").  As set forth below, All-Tag cannot create a genuine issue of fact that the advertising was false, material, and likely to induce reasonable reliance—let alone meet the higher bar of showing that they were **clearly** so.  *See Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F.

Supp. 3d 385, 421 (S.D.N.Y. 2014) ("Literal falsity and 'clear' falsity cannot be read to mean the same thing.").  Nor can All-Tag create a genuine issue of fact on the other factors courts consider.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████

      Moreover,  All-Tag  not  only  ███████████████████████████████████

███████████████████████████████    *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) (affirming judgment as a matter of law where advertising was susceptible to neutralization or other offset; "The argument that its neutralization efforts were not completely successful is unavailing; the test refers to 'susceptible to neutralization' not 'successful in neutralization.'").  For example,  ███████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

17

██████████

█████████   This type of back and forth advertising is exactly what the Seventh Circuit contemplated in *Schachar* when it held that regardless of whether such statements are "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas." *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989).

Numerous other courts have likewise held that comparative advertising of the type here are not cognizable methods of market-wide foreclosure under the antitrust laws. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 895-97 (5th Cir. 2016) (holding false advertising that defendant produced the "world's sharpest needle" and its syringes have "low waste space" are not cognizable under the antitrust laws); *Aquatherm*, 145 F.3d at 1263 (affirming dismissal of antitrust claim based on false advertising that electric pool heaters were "the most cost-effective pool heating method available" because only claim was that false advertising harmed plaintiff's business); *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1072 (damaged reputation from rumors spread by competitor present no harm to competition: "damage to a single competitor, even as a result of deliberate misinformation, does not state a claim under Section One of the Sherman Act"). As the Eleventh Circuit held in *Aquatherm*, All-Tag's "only claim is [Checkpoint] acted unfairly by disseminating false information, and this unfair competition in turn harmed [All-Tag's] business.  This claim of unfair competition is ***not*** sufficient to support a claim under § 1 or any other federal antitrust provision."  145 F.3d at 1263 (emphasis in original).

The decision in *Reed Const. Data Inc.* addresses facts nearly identical to those alleged by All-Tag here. In *Reed*, the plaintiff alleged that defendant conducted false product comparisons using a third party it advertised as an "independent entity."  The plaintiff alleged that the "independent" test was a sham, however, because the third-party did little more than send someone to sit in a room and watch the defendant's employee perform the comparisons—which the plaintiff alleged were biased to favor the defendant's product.  The defendant then advertised its "third party" report showing that defendant's product performed over 70% better and had a five to one advantage over plaintiff's product.  49 F. Supp. 3d at 394-95.  Granting summary judgment on the antitrust claims based on alleged false advertising, the *Reed* court held, *inter alia*, that plaintiff could not rebut the *de minimus* presumption given that plaintiff only had one declaration showing that consumers relied on the alleged misstatements and that evidence in the record showed that

"plenty of buyers conducted their own analysis when deciding which service to purchase." *Id.* at 421-22. Here, All-Tag has ***no*** such evidence and thus its claim cannot survive summary judgment.

### 4. Misappropriation of trade secrets is a business tort, not an antitrust violation.

In March 2018, this Court held that All-Tag had failed to identify with particularly any trade secrets that Checkpoint had misappropriated. (DE 33.) Although the third iteration of All-Tag's complaint drops its misappropriation of trade secrets claim, All-Tag now alleges that Checkpoint's misappropriation constitutes a violation of the antitrust laws under the Sherman Act. This claim fails for the same reason the false advertising fails: the antitrust laws are not intended to protect individual competitors, but rather competition.

The Supreme Court recognized in *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993), that the antitrust laws "do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." This is so even for "an act of pure malice by one business competitor against another." *Id.*; *see also Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 751 (9th Cir. 1984) ("Such awards threaten to make every business tort convertible into a treble-damage bonanza. The antitrust laws were not intended as a balm for all wrongdoing in the business community.") (Kennedy, J., dissenting); *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1072 (claim that defendant induced plaintiff's employees to breach their contracts not cognizable under antitrust laws).

The antitrust laws simply do not provide All-Tag a remedy for ordinary business torts such as misappropriation of trade secrets that may hurt a single competitor—All-Tag—rather than hurt competition as a whole. *See Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 538-39 (W.D. Pa. 2019) (dismissing claim where plaintiff could not show "non competitive effects of the alleged misappropriation of its trade secrets" such as "antitrust injury, harm to competition, and market wide price increases and quantity reductions"); *Monitor Bus. Machines, Inc. v. Am. Tel. & Tel. Co.*, No. CV 76-1423, 1978 WL 1336, at *2 (C.D. Cal. May 5, 1978) ("Misappropriation is not properly pleaded as an antitrust violation. The antitrust laws do not provide remedies for misappropriation and related commercial torts.").[12]

---

[12] Even if misappropriation of trade secrets could properly constitute anticompetitive conduct, All-Tag's expert ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ (SOF ¶ 78.)

### D.   All-Tag Cannot Show Harm To Competition.

"Harm to competition is a necessary element of all private antitrust suits under Sections 1 and 2 of the Sherman Act." *Am. Key Corp.*, 762 F.2d at 1579 n.8.  This means that All-Tag must allege a "factual connection between the alleged harmful conduct and its impact on competition in the market." *Jacobs*, 626 F.3d at 1339.  All-Tag "may not meet its burden of showing actual anticompetitive effects with mere conclusory assertions; rather, [the Eleventh Circuit has] repeatedly required a plaintiff to point to specific facts demonstrating harm to competition." *Procaps S.A.*, 845 F. 3d at 1084.

Here, All-Tag cannot raise a genuine issue of material fact on harm to competition for two reasons.  ***First***, it is impossible for All-Tag to demonstrate substantial foreclosure of the market because, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████  ***Second***, even if All-Tag could show substantial foreclosure, no facts link Checkpoint's conduct to actual harmful effects on competition: reduced output, increased prices, or deterioration in quality.

#### 1.   All-Tag cannot demonstrate substantial foreclosure through exclusive contracts and bundled discounts.

Regardless of whether ████████████████████████████████████████████ ████████████████████████████████████ to have a market-wide anticompetitive effect, Checkpoint must have exclusive agreements that "foreclose competition in a substantial share" of the relevant market.  *Tampa Elec. Co.*, 365 U.S. at 327; *E. Food Servs., Inc.*, 357 F.3d at 7 ("[A] contract restricting a small percentage of a larger available market will have no anti-competitive effect on that market.").  Here, All-Tag cannot demonstrate substantial foreclosure for two reasons.

***First***, All-Tag has no ***actual*** evidence on how much of the RF label market was foreclosed by Checkpoint's purported exclusive contracts because ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████  Without the true percentage of foreclosure, All-Tag cannot show that a "substantial share" was so foreclosed.  *Tampa Elec. Co.*, 365 U.S. at 328 ("[T]he opportunities for other traders to enter into or remain in that market must be significantly limited."); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) ("Exclusive dealing

is an unreasonable restraint on trade [under Section 1 of the Sherman Act] only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.") (citation omitted); *E.T. Barwick Indus., Inc v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1347 (N.D. Ga. 1987) (granting summary judgment where plaintiff did not present any statistical evidence reflecting the amount of competition foreclosed).



hold that "[f]or exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (affirming directed verdict noting "low [foreclosure] numbers make dismissal easy"); *Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112, 124 (1st Cir. 2011) (affirming summary judgment where foreclosure through exclusive contracts peaked at 30.8%).

### 2. All-Tag has no facts linking Checkpoint's conduct to harm to competition: reduced output, increased prices, or deterioration in quality.

All-Tag's claims are premised on Checkpoint's purported high market share and sales that All-Tag believes it lost to Checkpoint. However, the law is clear that neither is sufficient to show harm to ***competition***. *Spanish Broad. System of Fla., Inc.*, 376 F.3d at 1071 ("[A]n antitrust plaintiff must show harm to competition rather than competitors."); *Jacobs*, 626 F.3d at 1340 ("[A] showing of market power is necessary, but not sufficient, to establish potential harm to competition."); *Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1043 (11th Cir. 1982) ("The use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws.").

All-Tag does not, and cannot, point to specific facts showing actual harm to competition—reduced output, increased prices, or deterioration in quality. *Jacobs*, 626 F.3d at 1339; *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984) (describing "raise[d] prices and reduce[d] output" as the "hallmarks of anticompetitive behavior").   To the contrary, ███████████ ████████████████████████████████████████████████████ (SOF ¶ 24.) And All-Tag does not contend that output has decreased or quality has declined.

Perhaps the most powerful evidence showing competition remains intact is the evidence from customers themselves.   Customer after customer has testified that ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████ Sometimes Checkpoint won and sometimes it lost, but consumers won by virtue of competition in the market.

For example, ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

If competition had been harmed, then ████████████████████████████████ ████████   Yet, the evidence shows that time and again Checkpoint had to do so.  If competition had been harmed, All-Tag would have evidence from customers showing that they would rather have done business with All-Tag but were strong-armed by Checkpoint.  All-Tag has none.  Not a single customer has testified that the market lacks competition or that they have no alternative to Checkpoint.  The Court should grant summary judgment because the undisputed facts simply do not fit All-Tag's claims.[13]  As the Seventh Circuit aptly recognized, "[w]hen the consumers favor a product or practice, and only rivals squawk, the most natural inference is that the complained-of

---

[13] Indeed, even All-Tag's own claims cannot be reconciled with each other.  While All-Tag alleges that Checkpoint engaged in false advertising and misappropriation of trade secrets to take sales away from All-Tag, such conduct—even if true—demonstrates that competition *exists* in the market.  A company with monopoly power does not need to engage in false advertising against competitors or use competitor trade secrets to gain business.  It would be able to win business simply because customers have no other alternative.  No customer has so stated and clearly that is not the case here.

practice promotes rather than undermines competition, for what helps consumers often harms other producers." *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (affirming summary judgment for entity with exclusive deals).

### III. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON ALL-TAG'S FALSE ADVERTISING AND UNFAIR COMPETITION CLAIMS IN COUNTS IV, VII, AND VIII.

All-Tag's Second Amended Complaint brings false advertising claims under Section 43(a) of the Lanham Act (Count IV), common law unfair competition (Count VII), and Florida Statute § 817.41 (Count VIII). All-Tag's hodgepodge of false advertising complaints appear to be based on the following alleged so-called "advertising": (1) 2004 statements by Checkpoint employees that All-Tag labels would not reliably deactivate (SAC ¶ 56); (2) a 2009 YouTube video demonstrating that All-Tag labels did not work when applied to Blu-Ray disc packages (SAC ¶ 57); (3) a 2010 "audit" of All-Tag labels showing that a substantial number of All-Tag labels failed (SAC ¶ 58); (4) a 2012 TUV study comparing the performance of Checkpoint and All-Tag labels (SAC ¶¶ 60-62); (5) a 2016 TUV study comparing Checkpoint and All-Tag labels (SAC ¶ 65); (6) statements to "customers, including Procter and Gamble and Diamond Packaging," that Checkpoint "labels result in a 20% improvement in efficiency in production" (SAC ¶ 73); and (7) "Checkpoint employees have held themselves out as employees of Checkpoint's customers in order to persuade other customers to purchase Checkpoint products."[14] (SAC ¶ 74).

"The elements of a claim under the Lanham Act for false advertising are: (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be— injured as a result of the false advertising."[15] *Johnson & Johnson Vision Care, Inc. v. 1-800*

---

[14] All-Tag does not allege how many of these purported statements constitute "advertising" at all. *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (statements must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the industry). With respect to SAC ¶ 74, no "statement" is alleged at all.

[15] The 11th Circuit has held that unfair competition claims are analyzed in the same way as Lanham Act claims. *Suntree Techs., Inc.*, 693 F.3d at 1345; *see Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1296 (11th Cir. 2012) (dismissing unfair competition claim because its success "is tied to the federal Lanham Act claims"). Misleading advertising claims under Fla. Stat. § 817.41 require proof of the elements of the common law tort of fraud in the inducement. *Smith v. Mellon Bank*, 957 F.2d 856, 858 (11th Cir. 1992).

*Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).  While a court "should consider context, it may not *assume* context."  *Id*. at 1248.  Accordingly, each advertisement must be assessed independently and must meet each of these elements.  *Id*. ("The problem with the district court's approach [of evaluating the advertisements in concert rather than independently] is the assumption that consumers will be exposed to every advertisement in a campaign.").

Here, summary judgment is appropriate on All-Tag's false advertising claims.

### A.   All-Tag Has No Evidence To Overcome The Laches Presumption For Statements Made Nearly A Decade Ago Or Any Evidence To Otherwise Support The Claims.

All-Tag's claims based on alleged false "advertisements" in 2004, 2009, and 2010 are all presumptively barred by laches.  (SAC ¶¶ 56-58).  *Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*, No. 08-61456, 2010 WL 331752, at *10 (S.D. Fla. Jan. 20, 2010) (after four years, "the presumption is that laches is a bar to suit."); *see also AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986) ("The pertinent limitations period for this type of action in Florida is four years.").  Even if All-Tag could overcome the presumption, All-Tag has no evidence to support *any* of the elements for these decade-old claims—let alone *all* of the elements.  Accordingly, summary judgment must be granted on these claims.

### B.   All-Tag Cannot Assert That Checkpoint's Advertising Is Misleading Because All-Tag Has No Evidence Of Customer Deception.

All-Tag's SAC continually repeats the refrain that Checkpoint's advertisements are "false and misleading."  (*See, e.g.,* SAC ¶ 63 ("All of these claims are false and misleading."), ¶ 69 ("The claims are false and misleading"); ¶ 72 ("Checkpoint's false and misleading claims…"), ¶ 103 ("These misrepresentations constitute false or misleading description of fact, or false or misleading representation of fact…").)  While All-Tag may have been content to ride two horses during fact discovery, it can no longer do so now that discovery is closed.  If an advertisement is simply misleading (rather than "literally false"), then All-Tag must present evidence that a substantial portion of the consuming public was *actually deceived* by the advertising.  *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 745 F. Supp. 2d 1359, 1377 (S.D. Fla. 2010), *aff'd*, 702 F.3d 1312 (11th Cir. 2012) (granting summary judgment because no reliable consumer or market research showed that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement).

Here, All-Tag performed no scientific customer or market survey research nor does it have evidence from a single customer—let alone a statistically significant portion of customers—that

they were deceived. *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 391 F. Supp. 2d 1148, 1165 (S.D. Fla. 2005) (a plaintiff attempting to establish that an advertisement is misleading "must present evidence of deception in the form of consumer surveys, market research, expert testimony, or other evidence.") (internal quotation omitted); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004) ("Consumer survey research often is a key part of a Lanham Act claim alleging that an advertisement is misleading or deceptive."); *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1347 (M.D. Fla. 2006) (to satisfy deception element, a plaintiff must produce evidence of actual consumer reaction or surveys showing that a substantial number of consumers were actually misled by the advertisements); *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1247 (if "'full-blown consumer surveys or market research'" are not available, the plaintiff still must provide expert testimony or other evidence) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1183 (8th Cir. 1998)).

Because All-Tag has no evidence of customer deception, the Court must grant summary judgment on any All-Tag claims based on alleged misleading advertising.

### C.   All-Tag Cannot Meet Its Affirmative Burden Of Showing That Checkpoint's Marketing Of Comparative Testing Does Not Establish The Propositions For Which They Are Cited.

Most of All-Tag's claims, including those based on statements alleged in SAC ¶¶ 57, 58, 60-62, 65, and 73, are premised on ██████████████████████████████████ ███████████████████████████. As set forth above, All-Tag must prove not just that these tests are "misleading," but that they are, in fact, "literally false."  Moreover, where, as here, advertising is based on the results of purported testing, the Eleventh Circuit has adopted a standard giving the plaintiff the affirmative burden to prove that the tests do not establish the proposition for which they are cited.  *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1248-49; *Inmuno Vital, Inc. v. Golden Sun, Inc.*, 49 F. Supp. 2d 1344, 1360 (S.D. Fla. 1997) ("[T]he party challenging the advertisement establishes its burden by showing that the tests did not establish the proposition for which they were cited.").

To meet its burden, All-Tag would have to show that the tests advertised by Checkpoint ***could not*** have achieved the cited results.  It has no evidence to meet that burden.  All-Tag retained no expert to replicate the tests cited by Checkpoint to prove that the tests do not establish the proposition for which they are cited.  To the contrary, All-Tag's expert ██████████████ ████████████████████████████████ (SOF ¶ 82.)



At most, All-Tag has evidence that ███████████████████████████████████████████████████████████████ (SOF ¶¶ 75-76.)  All-Tag has no evidence that ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ do not show that the tests cited by Checkpoint fail to establish the proposition for which they are cited.  *See Sanderson v. Culligan Int'l* Co., 415 F.3d 620, 624 (7th Cir. 2005) (Lanham Act was not "designed to throw into federal court all disputes about the efficacy of competing products…scientific disputes must be resolved by scientific means," not federal courts).

Nor can All-Tag meet its burden by ████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████ *Johnson & Johnson, Inc.*, at 1249 ("The fact that a study's design is imperfect, however, does not render [the] advertisements false.").  To succeed, All-Tag must prove that the tests *that were actually run* did not achieve the results actually cited.  All-Tag has no evidence to meet this burden.

### D.  All-Tag Has No Evidence That Checkpoint's Advertising Materially Influenced Customers' Purchasing Decisions.

To succeed on its false advertising claims, All-Tag must also prove that the alleged false advertising "had a material effect on purchasing decisions."  *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1247.  All-Tag must establish materiality even if Checkpoint's advertising is literally false.  *Id*. at 1250.  "The materiality requirement is based on the premise that not all deceptions affect consumer decisions."  *Id*.

In *Johnson & Johnson*, the district court found that advertising stating that Johnson & Johnson had contracted with "eye doctors" was literally false because it had instead contracted with "eye care practitioners."  *Id*.  The Eleventh Circuit reversed because the plaintiff did not prove that the "use of the term 'eye doctor' was material to consumer decisions."  *Id*.  The *Johnson & Johnson* Court analogized the advertising to that in *Motorola.*, where the Second Circuit analyzed a press release stating that SportsTrax provides "updated game information direct from each arena" which "originate[s] from the press table in each arena."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (cited by *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1250).  Although the game information came from television and radio broadcasts—and thus not

26

"from the arena"—"[c]onsumers were interested in the fact that statistics were updated quickly, and did not make purchasing decisions based on whether data was collected firsthand or through broadcasts." *Johnson & Johnson Vision Care, Inc.*, 299 F.3d at 1250.

As in *Johnson & Johnson* and *Motorola*, All-Tag has no evidence that the alleged false advertising had a material effect on customer's purchasing decisions.  All-Tag cannot create a material issue of fact without evidence from a single customer stating that customers materially relied on advertising material from vendors to make purchasing decisions.  In fact, the evidence directly from customers is completely to the contrary.  Testimony from ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

Checkpoint's customers are ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Without any evidence from customers, and in the face of its own testimony, All-Tag relies entirely on ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  To hold otherwise would require disregarding  direct  evidence  from  customers  concerning  what  was  material  to  their  actual

---

purchasing decisions in favor of evidence from non-purchasers opining on what someone else may have thought was material when that someone else purchased a product.

Even with this "second hand" evidence, All-Tag cannot prove which aspect of the advertising material may have been material to a customer's purchasing decision.  For example, All-Tag offers:



Without evidence from a single customer that the allegedly false or misleading advertising materially influenced a single customer's purchasing decision—and facing a litany of evidence directly from customers to the contrary—All-Tag cannot create a triable issue of fact.

### E.   All-Tag Has No Evidence Linking Any Of The Advertising To Damages It Alleges It Has Suffered.

A plaintiff seeking damages for lost sales must prove that the allegedly false advertising actually caused it damages.  In *Air Turbine Tech., Inc. v. Atlas Copco AB*, 295 F. Supp. 2d 1334 (S.D. Fla. 2003), Judge Marra granted summary judgment for a defendant competitor sued for, *inter alia*, false advertising by the owner of a patent for a pneumatic pressure braking mechanism for rotary apparatus.  The court held that there was no material issue of disputed fact as to causation of the plaintiff's damages from the alleged false advertising where the only evidence was sworn testimony from its employees and distributors that customers told them at trade shows that they will not buy plaintiff's tool because they had defendant's tool just like it and it did not operate as they would like.  *Id.* at 1344, *aff'd* 410 F.3d 701, 709–10 (Fed. Cir. 2005); *IQ Prods., Co. v. Pennzoil Prods., Co.*, 305 F.3d 368, 376 (5th Cir. 2002) (affirming summary judgment where no evidence customers would have bought plaintiff's products in absence of false advertising); *3M Innovative Properties Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 972–73 (D. Minn.

2005) (granting summary judgment on false advertising claims because plaintiff did not present evidence that would allow a reasonable jury to rule in its favor on the issues of materiality or causation: "the change in the parties' sales positions is simply that, a change.  But it has not been linked to the specific advertising claims challenged here, a critical omission given the many claims made in this advertising."); *Brown v. Armstrong*, 957 F. Supp. 1293, 1303–04 (D. Mass 1997.), *aff'd*, 129 F.3d 1252 (1st Cir. 1997) (granting summary judgment where there is "'no evidence to link the loss of Plaintiffs' sales to any falsity in defendant's [advertisement]'").

Here, All-Tag's expert admitted



Even if All-Tag could show that its business decreased during the general period of time of the allegedly offending advertising (of which it also has no evidence), All-Tag must still establish causation between the business decrease and Checkpoint's actions.  *See Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984) (in a Lanham Act claim for false advertising the Plaintiff is only entitled to damages caused by the violation). Because All-Tag has no evidence linking any specific false advertising to any specific lost sales, the Court must grant summary judgment on All-Tag's claims.[18]

---

[17]  Following his affirmative expert report and deposition, All-Tag's expert attempted to "supplement" his opinions with a new damages opinion ███████████████████████ The Court struck the supplemental opinion and held that All-Tag cannot rely on it.  DE 263, DE 276.

[18]  In *Johnson & Johnson Vision Care, Inc.*, the Eleventh Circuit held that all five prongs of the Lanham Act must be met regardless of whether a party seeks money damages or injunctive relief. 299 F.3d at 1247.  Accordingly, summary judgment should likewise enter on All-Tag's request for injunctive relief.

## IV. THE COURT SHOULD GRANT SUMMARY JUDGMENT ON CHECKPOINT'S AFFIRMATIVE DEFENSES.

The Court should grant summary judgment on Checkpoint's Second and Fifth Affirmative Defenses (respectively, (1) estoppel, laches and/or waiver, and (2) release).  DE 175 (filed under seal), DE 176 (redacted).  Summary judgment on affirmative defenses is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006).  As demonstrated in Checkpoint's concurrently filed Motion for Summary Judgment on Counts I and II of Its Second Amended Counterclaim, ███████████████████████████████████████████████████████████████████████████████ The same reasons demonstrating Checkpoint's entitlement to relief on Counts I and II of its Counterclaim also apply to Checkpoint's Second and Fifth Affirmative Defenses of estoppel, waiver, and release.

To prove release as an affirmative defense, Checkpoint need only prove, which it has, the existence of a contract that releases the claims asserted here.  *See Watts v. Butte School Dist.*, 939 F. Supp. 1418, 1424 (D. Neb. 1996) (granting summary judgment to defendant on basis of release when plaintiff could not prove that contract terms should not be enforced).  To prove waiver as an affirmative defense, Checkpoint need only prove, which it has, a right existed at the time of the waiver, that All-Tag had actual or constructive knowledge of the right, and that All-Tag intended to relinquish the right. *Fifth Third Bank v. Alaedin & Majdi Invs., Inc.*, No. 11-cv-2206, 2012 WL 1137104, *3 (M.D. Florida 2012). To establish estoppel as an affirmative defense, Checkpoint need only prove, which it has, that All-Tag made a representation of material fact that is contrary to a later stated position, Checkpoint's reliance, and a change in position that is detrimental to Checkpoint.  *Id.* at * 4. Accordingly, Checkpoint is entitled to summary judgment on its Second and Fifth Affirmative Defenses.

**REQUEST FOR HEARING**

In accordance with Local Rule 7.1(b)(2), Checkpoint, through its attorneys, respectfully requests oral argument on this Motion.  Counsel believes that oral argument would be helpful to allow the Court to ask counsel questions regarding the competing AM and RF EAS technologies, the relevant markets at issue, and the competition for individual customers described above. Further, the Court may better determine through oral argument whether no genuine issue of material fact exists on Plaintiff's antitrust and false advertising claims, including based on the insufficiency of Plaintiff's evidence regarding a relevant market, anticompetitive conduct, harm to competition, the materiality of false advertising, and damages caused by the false advertising. Counsel believes that one hour should be sufficient time for the argument.

**CONCLUSION**

For the reasons stated above, the Court should grant Checkpoint summary judgment on all of All-Tag's claims.


Dated: October 11, 2019                              Respectfully submitted,


                                                     /s/ Gavin C. Gaukroger


Gavin C. Gaukroger (Fla. Bar. No. 768489)           Robert J. Palmersheim (*pro hac vice*)
Kenneth W. Waterway (Fla. Bar. No. 994235)          Anand C. Mathew (*pro hac vice*)
BERGER SINGERMAN LLP                                 Julie M. Mallen (*pro hac vice*)
350 East Las Olas Boulevard, Suite 1000             PALMERSHEIM & MATHEW LLP
Fort Lauderdale, Florida 33301                       401 N. Franklin Street, Suite 4S
Tel: (954) 525-9900                                  Chicago, Illinois 60654
Fax: (954) 523-2872                                  Tel: (312) 319-1791
ggaukroger@bergersingerman.com                       Fax: (312) 878-2890
kwaterway@bergersingerman.com                        rjp@thepmlawfirm.com
                                                     acm@thepmlawfirm.com
                                                     jmm@thepmlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 11, 2019, a true and correct copy of the foregoing was filed with the Clerk of the Court using CM/ECF which will generate and serve a Notice of Electronic Filing to the following:

Damon Suden
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
212-808-7800
Email: dsuden@KelleyDrye.com

Julian Solotorovsky
Kelley Drye & Warren LLP
333 West Wacker Drive
Chicago, IL 60606
312-857-7070
Email: jsolotorovsky@KelleyDrye.com

William A. MacLeod
Kelley Drye & Warren LLP
3050 K Street NW, Suite 400
Washington, DC 20007
202-342-8811
Email: wmacleod@kelleydrye.com

Christopher W. Kammerer
John F. Mariani
Kammerer Mariani PLLC
1601 Forum Place, Suite 500
West Palm Beach, FL 33401
561-990-1592
Email: ckammerer@kammerermariani.com
Email: jmariani@kammerermariani.com

John B. Williams
Williams Lopatto PLLC
1707 L Street NW, Suite 550
Washington, DC 20036
202-296-1611
Email: jbwilliams@williamslopatto.com

*/s/ Gavin C. Gaukroger*